Ernest Wolfgang BRAUCH,
Petitioner, Appellant,

v.

Robert RAICHE, United States Marshal,
Respondent, Appellee.

No. 79–1606.

United States Court of Appeals,
First Circuit.

Argued Jan. 11, 1980.

Decided March 5, 1980.

Nancy Gertner, Boston, Mass., with whom Harvey A. Silverglate, Silverglate, Shapiro & Gertner, Boston, Mass., Alan Dershowitz, Cambridge, Mass., John Blackburn-Gittings, and Hallinan, Blackburn-Gittings & Co., London, England, were on brief, for appellant.

Robert J. Lynn, Asst. U. S. Atty., Concord, N.H., with whom William H. Shaheen, U. S. Atty., Concord, N.H., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

Ernest Wolfgang Brauch was arrested in Vermont on July 9, 1979, pursuant to the provisional arrest procedures of Article VIII(1) of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland ("the Treaty"). As required by the Treaty, the government of the United Kingdom subsequently filed a formal request for Brauch's extradition. On September 13, 1979, a hearing on the extradition request was held before a federal magistrate in New Hampshire.[1] Sitting as a committing magistrate under 18 U.S.C. § 3184, the magistrate found Brauch extraditable on three separate sets of charges and issued a Certificate of Extraditability and Order of Commitment on October 18, 1979. Brauch then brought a petition for habeas corpus in the district court for the District of New Hampshire seeking relief from the magistrate's order. The district court denied Brauch's petition on November 2, 1979, and he brought this appeal. The magistrate's Certificate of Extraditability has been stayed pending the outcome of this appeal.

### The Facts

The United Kingdom's extradition request set forth charges against Brauch for violating three provisions of the English criminal laws: seven counts of violating

---

1. Brauch was arrested in Vermont but brought before a magistrate in New Hampshire because the arresting agents were assigned to the FBI's Concord, New Hampshire, office and were unfamiliar with the names or locations of magistrates in Vermont.

section 16(1) of the Theft Act of 1968[2] (the "check charges"); three counts of violating section 6(1) of the Forgery Act of 1913[3] (the "forgery charges"); and ten counts of violating section 15(1) of the Theft Act of 1968[4] (the "currency charges"). These charges arise out of two independent series of transactions engaged in by Brauch in 1974 and 1975. The formal request for extradition included the English depositions and exhibits upon which these charges were based, and at the hearing before the magistrate the government presented these exhibits and depositions in support of its petition for an extradition certificate. The factual allegations and the English charges resulting from them may be summarized as follows.

## A. The Commodities Transactions

From 1967 through 1974, Brauch was engaged in commodities trading on the London Commodities Terminal Markets. At different times during this period Brauch maintained trading accounts at five London brokerage houses in the names of several different trading companies.[5] To open these trading accounts, Brauch was required to make deposits to cover the cost of the initial dealings. Thereafter, if the value of the commodities purchased for the account declined due to market fluctuations, Brauch would receive a "margin call" requiring him to deposit additional funds to cover the decreased value of the assets held by his account.

In 1974 the commodities markets suffered a period of sharp decline. On January 3, 1974, Anthony Gibbs Commodities, Ltd., with whom Brauch had been trading since 1967, made a margin call on the account of one of Brauch's trading companies, Commodities Investment Trust. Brauch responded by sending Gibbs a check for £80,000 drawn on the account of another of Brauch's companies, Neptune Finance, Ltd. The check did not clear, however, and when no further funds were forthcoming, Gibbs, closed out Brauch's trading accounts, which by then had a deficit of £55,000 owing to Gibbs.

Brauch had also traded since 1967 with the brokerage firm of E. Bailey & Company, Ltd. Although Brauch had had difficulties meeting deficiencies in his account during 1973, Bailey allowed him to open a new account and commence trading under the name of Commodities Investment Trust, with the account personally guaranteed by Brauch. On May 15, 1974, Brauch wrote a check drawn on Neptune Finance to Bailey for £103,000 to meet a margin call, but the bank refused to honor the check for want of proper signature. On May 22, in response to a second margin call, Brauch gave Bailey a check for £300,000, signed by one M. Fulton and drawn on the account of Skokie Investments, Ltd., at the Bank of Montreal in the Bahamas. Brauch told Bailey that the check represented proceeds from the sale of some property to Fulton. When Bailey attempted to cash the check, however, it was informed that there were no funds in the Skokie account. Bailey finally closed out Brauch's account and liquidated his holdings in mid-June, resulting in a deficit of £527,825.

---

2.  Section 16(1) provides:

   "(1) A person who by any deception dishonestly obtains for himself or another any pecuniary advantage shall on conviction on indictment be liable to imprisonment for a term not exceeding five years."

3.  Section 6(1) provides:

   "(1) Every person who utters any forged document, seal, or die shall be guilty of an offence of the like degree (whether felony or misdemeanour) and on conviction thereof shall be liable to the same punishment as if he himself had forged the document, seal, or die."

4.  Section 15(1) provides:

   "(1) A person who by any deception dishonestly obtains property belonging to another, with the intention of permanently depriving the other of it, shall on conviction on indictment be liable to imprisonment for a term not exceeding ten years."

5.  Brauch maintained accounts in the names of Commodities Investment Trust, Derrible, Ltd., Hellergrange, Ltd., Basin Investments, Ltd., International Colloids, Ltd., and Histon Developments, Ltd.

As a result of the allegedly bad checks issued to Gibbs and Bailey, and similar incidents regarding accounts opened during 1974 at G. W. Joynson & Company, Ltd., M. L. Doxard & Company, and Cometco Investments, Ltd., an indictment was returned against Brauch charging seven counts of "obtaining pecuniary advantage, namely the evasion of a debt" by means of "deception", in violation of section 16(1) of the Theft Act of 1968 (the check charges). The theory underlying these charges, accepted by the magistrate at the commitment hearing, is that by issuing these checks, Brauch was able to engage in further trading by forestalling his brokers from closing out his accounts. Moreover, as a consequence of their delay in liquidating Brauch's accounts, which in turn resulted from their reliance on Brauch's assurances that the checks he had presented would be honored, the brokers suffered additional losses between the time of their margin calls and liquidation.

The forgery charges arise out of Brauch's dealings with one of these brokers, Cometco Investments, Ltd. As a precondition for allowing Brauch, acting through the name of Histon Developments, Ltd., to establish a trading position, Cometco had demanded that Brauch deposit £84,000. On August 5, 1974, Brauch delivered a check in that amount drawn on the account of Skokie Investments at the Bahamas branch of the Bank of Montreal. On August 7, Cometco learned that the check would not clear and demanded a telex confirmation from the bank that the funds would be received or else Brauch's trading position would be closed out. That same day Cometco received a telex from Skokie Investments assuring it that the proceeds of the check would be paid by August 13 or 14. On August 9, with Brauch's account showing a deficit of £20,000, Cometco again asked for assurances. Brauch reported that the London office of the Bank of Montreal had received a telex that the £84,000 was being sent forthwith. When Cometco confirmed that this telex had been received, it once again permitted Brauch to maintain an active trading account. Finally, after Cometco still had not received the funds by August 15 and Brauch now faced a £60,000 margin call, the Bank of Montreal in London received a third telex stating that the funds were en route to London. Cometco never received the funds, however, and finally closed Brauch's account on August 20, 1974.

These three telexes form the basis of the three counts of uttering forged documents in violation of section 6(1) of the Forgery Act of 1913. The magistrate, after reviewing the evidence before him, concluded that neither Skokie nor the Bank of Montreal had sent any of the three telexes and therefore that Brauch had "sent or caused to be sent" the telexes.

### B. *The Currency Transactions*

The events forming the basis of the currency charges against Brauch occurred while the Exchange Control Act of 1947 was in force in England.[6] The Act sought to freeze the amount of foreign investments held by residents of England by restricting the flow of money out of the country. The Act created two classes of foreign currency—that subject to the restriction on exportation, and a second class, which came to be known as "investment currency", that could be invested abroad without obtaining special permission from the Bank of England. Because investment currency could be invested abroad, a market developed for this currency. It was sold at a premium over the exchange rate for ordinary restricted currency. Since all currency looked alike, a system evolved in which "authorized depositories" would certify appropriate currency as being investment currency. Once certified, such currency could be freely traded on the currency market at a premium.

In 1974 Brauch approached a firm of English solicitors and requested that they prepare a power of attorney to him from one Christina Reigleuth, a British citizen. Using this power of attorney, apparently with a forged signature, Brauch approached

---

**6.** The Exchange Control Act was repealed on October 24, 1979.

one William Crossley of the accounting firm of W. O. Crossley & Co. to sell, purportedly on Reigleuth's behalf, a packet of Grand Cayman bonds. Under then-prevailing law, if the bonds had been owned by a resident of the United Kingdom continuously since 1972, the proceeds from the sale of the bonds would issue in investment currency. Thus, by representing that Ms. Reigleuth, not himself, was the owner of the bonds, Brauch was able to secure premium-worthy investment currency from the sale. On a number of occasions from December, 1974, through early 1975, using similar means, Brauch arranged to exchange foreign securities or currency for investment currency by convincing Crossley and others to assure authorized depositories (London banks) that the currency was worthy of certification. Once these proceeds were certified, Brauch was able to convert the currency into pounds sterling on the money markets at the premium rate. During this period, Brauch realized a net sum of £2,500,000 from such transactions.

Brauch was indicted under both the Exchange Control Act and section 15(1) of the Theft Act of 1968 for each of ten such transactions. The basis for the charges under the Theft Act is that Brauch dishonestly obtained from the Midland Bank British pounds sterling by falsely representing that the currency he offered in exchange was investment currency.

### Requirements for Extradition Under the Treaty

■ As a threshold matter, we note that habeas corpus review of a magistrate's extradition order is more limited than direct appeal, which is not available in extradition cases. *Greci v. Birknes*, 527 F.2d 956, 958 (1st Cir. 1976). The scope of our inquiry, therefore, is limited to determining "whether the magistrate had jurisdiction, whether the offense charged is within the treaty and by a somewhat liberal construction, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542,

69 L.Ed. 970 (1925). Although appellant asserts that he is entitled to relief under each of these grounds for habeas corpus, the heart of his argument is that the magistrate misapplied the choice of law and "double criminality" principles embodied in the Treaty in determining whether the offenses charged were extraditable.

■ Article III of the Treaty provides:
"(1) Extradition shall be granted for an act or omission the facts of which disclose an offense within any of the descriptions listed in the Schedule annexed to this Treaty, which is an integral part of the Treaty, or any other offense, if:
(*a*) the offense is punishable under the laws of both parties by imprisonment or other form of detention for more than one year or by the death penalty;
(*b*) the offense is extraditable under the relevant law, being the law of the United Kingdom or other territory to which this Treaty applies by virtue of sub-paragraph (1)(*a*) of Article II; and
(*c*) the offense constitutes a felony under the law of the United States of America."

This section of the Treaty imposes on all extraditable offenses a requirement of "double criminality"—that is, an offense for which extradition is sought must be a serious crime punishable under the laws of both countries. The requirement that the acts alleged be criminal in both jurisdictions is central to extradition law and has been embodied either explicitly or implicitly in all prior extradition treaties between the United States and Great Britain since the Jay Treaty of 1794. *See Collins v. Loisel*, 259 U.S. 309, 311, 42 S.Ct. 469, 470, 66 L.Ed. 956 (1922) (construing the Webster-Ashburton Treaty of 1842).

Two interpretive difficulties arise from the double criminality concept: when extradition is sought from the United States, what law should the extradition magistrate apply in determining whether the double criminality test is satisfied; and what degree of congruity is required between the corresponding English and American criminal offenses? The magistrate in this case

determined extraditability by reference to federal criminal law and to the law of New Hampshire, the "asylum state". Referring to these two bodies of law, the magistrate found that the acts that formed the basis for appellant's indictments in England also constituted violations of analogous criminal provisions under United States law. Appellant argues that the magistrate erred both in his choice of law and in his congruity analysis.

## A. Choice of Law

Under appellant's view of the proper extradition procedure, the Treaty language "punishable under the laws of both Parties" requires a magistrate to look first to federal law and then, if there is no federal provision comparable to the offense for which extradition is sought, to state law representing a consensus view of the states. New Hampshire law, he argues, is "idiosyncratic" and therefore inappropriate for determining extraditability under a treaty that refers not to the "law of the place where the fugitive is found", but to the "law of the United States".[7]

The Supreme Court decisions construing the predecessor treaties between the United States and Great Britain, while venerable, are hardly clear in defining the proper approach to the choice of substantive law for the purposes of determining extraditability. In Wright v. Henkel, 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948 (1903), the Court noted that it was the law of the states to which courts were to refer for "specific definitions" of the crimes subject to extradition. Construing a provision requiring that the offense for which extradition was sought be a crime "[against] the laws of both countries", the Court stated: "[W]hen by the

law of Great Britain, and by the law of the State in which the fugitive is found [the acts] are made criminal, the case comes fairly within the treaty  .  .  . ." Id. at 61, 23 S.Ct. at 786. See also Collins v. Loisel, supra (assuming that the asylum state's law was controlling); Kelly v. Griffin, 241 U.S. 6, 36 S.Ct. 487, 60 L.Ed. 861 (1916).

In Factor v. Laubenheimer, 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315 (1933), the Court addressed the choice of law principle implicit in Wright and Collins that extraditability could be established only on the basis of the asylum state's law. Examining the provisions of the extradition treaty with Great Britain then in force, the Court found that with respect to those offenses enumerated in the treaty, the United States and Great Britain had agreed that such offenses were "generally recognized as criminal in both countries" and that the only inquiry into the criminality of the acts alleged was that "necessary to make certain that the offense charged is one named in the treaty." Id. at 300, 54 S.Ct. at 198. The Court held, therefore, that absent an express requirement that the enumerated offenses be criminal under the laws of the asylum state, a fugitive could not escape extradition by showing that such an offense would not be punishable under that state's law. Id.

█ Although it is clear that Factor held criminality in the asylum state was not a necessary precondition to extraditability, it is not clear whether the Court also meant that a finding of criminality under that state's law was always sufficient to justify extradition. Part of the rationale offered by the Court for its decision in Factor was a desire to avoid construing that treaty so that "the right to extradition from the

7. Appellant's use of the term "idiosyncratic" in describing the various provisions of New Hampshire law relied on by the magistrate suggests that these provisions are in some sense exotic and divorced from the mainstream of American jurisprudence. This is not the case. The New Hampshire forgery statute, R.S.A. 638:1, which appellant terms idiosyncratic, is similar or identical to those of sixteen other states. Indeed, appellant's brief reveals that of the other types of forgery statutes adopted by

various states, none has been enacted by as many states as the type of provision in force in New Hampshire. Similarly, although the New Hampshire bad check statute, R.S.A. 638:4, does not represent the view of a majority of the states, eight states do have such statutes. Moreover, as the government notes, the New Hampshire statute is merely one species of the generally recognized crime of obtaining property by false pretenses. See W. LaFave & A. Scott, Handbook on Criminal Law § 92 (1972).

United States may vary with the state or territory where the fugitive is found." *Id.* at 300, 54 S.Ct. at 198. The Court was concerned that the treaty be construed so as to secure the intended equality and reciprocity between the parties. *Id.* at 293, 54 S.Ct. at 195. In light of the importance the Court placed on preserving reciprocity, we do not believe the Court's disapproval of extraditability varying with state law would extend to the situation in which one state's law might confer extraditability, while that of the preponderance of the states would not. A prerequisite under the Treaty for an extradition request by Great Britain is that the offense be one for which Britain would be willing to extradite. Thus, even if the asylum state from which Britain requests extradition is the only state criminalizing the conduct in question, the policy of reciprocity would be served since that state could presumably obtain extradition for the same acts from Britain.

Appellant notes that the trend of modern extradition treaties, in response to the growth of a body of federal and more uniform state substantive law, has been to include provisions referring to the law of the United States rather than to the law of the individual asylum state. Concomitant with this trend, appellant argues, recent cases have declined to apply asylum state law when treaty provisions refer to the law of the United States. Appellant finds particular support for this argument in our decision in *Greci v. Birknes, supra,* 527 F.2d 956. In *Greci* we construed the probable cause requirement of the 1973 extradition treaty between the United States and Italy, which requires that there be sufficient evidence to justify the fugitive's commitment for trial under the law of "the requested Party". We concluded that the reference to the law of the requested party mandated application of the federal probable cause standard.

We do not view our holding in *Greci* as controlling in this case.[8] *Greci* concerned both a different treaty and a different problem. In reaching our conclusion in that case, we noted that during the negotiation sessions prior to adoption of that treaty the parties specifically sought to avoid a probable cause standard that would vary depending on the state from which extradition was sought. 527 F.2d at 958–59 & n. 5. Appellant offers no evidence that the framers of this Treaty intended the adoption of the "laws of both Parties" language in Article III to require that the magistrate base his finding of extraditability solely on a consideration of federal or consensus state law. Moreover, the probable cause provision construed in *Greci,* which is identical to that contained in Article IX of this Treaty, is procedural. *See Factor v. Laubenheimer, supra,* 290 U.S. at 290–91, 54 S.Ct. at 194. The considerations that would militate in favor of a uniform procedural rule do not necessarily apply to construction of provisions involving choice of substantive law. Application of federal procedural standards in no way impinges on the objective of reciprocity. Indeed, in *Shapiro v. Ferrandina, supra,* 478 F.2d at 910 n. 18, Judge Friendly noted that referring to state law for "delineating substantive elements of a crime" and to federal law for corollary matters was "quite reasonable".

8. Nor do we find either of the other recent cases cited by appellant, *Shapiro v. Ferrandina,* 478 F.2d 894 (2d Cir. 1973), and *Freedman v. United States,* 437 F.Supp. 1252 (N.D.Ga.1977), to be convincing support for the construction he urges us to adopt. If anything, these cases support the approach followed by the magistrate here. In *Shapiro,* the treaty being construed had no explicit double criminality provision. The court looked first to the law of the asylum state, New York. Only after determining that the offense charged was not criminal under the law of New York did the court examine the laws of other states to determine whether the preponderance of the states crimi- nalized the acts charged. 478 F.2d at 911–12 (citing *Factor v. Laubenheimer, supra,* 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315). In *Freedman* the court construed the probable cause provision of the Webster-Ashburton Treaty between the United States and Great Britain as establishing a double criminality requirement. 437 F.Supp. at 1259. The court therefore applied the law of the asylum state as required by that provision, looking to the law of the other states only after determining that the offense charged was not criminal under Georgia law. *See also Hatfield v. Guay,* 87 F.2d 358 (1st Cir. 1937) (referring to the law of the asylum state first in determining extraditability).

We find neither the Supreme Court precedents nor the recent cases construing similar extradition treaties to be dispositive of the choice of law question in this case. While *Wright v. Henkel, supra,* on its face appears to command resort to the law of the asylum state, it was decided under a view of federal criminal law as nonexistent and state law as nonuniform—a situation far removed from the present state of criminal law. We do find guidance, however, in the policy that has consistently informed the Supreme Court's approach to extradition cases. In *Factor v. Laubenheimer, supra,* 290 U.S. at 293–94, 54 S.Ct. at 195–96, the Court stated that narrow construction of extradition treaties is inconsistent with the principle underlying international agreements of this nature. Thus, the Court said, when faced with competing constructions of such a treaty, that construction should be adopted that enlarges the rights of the parties under the treaty. We hold, therefore, that the magistrate correctly relied on the law of the asylum state, New Hampshire, in determining the extraditability of Brauch for the offenses charged, regardless of whether that law represents the law of the preponderance of the states.[9]

B. *Comparability of Offenses*

█ Appellant argues that in addition to determining extraditability by reference to the wrong substantive law, the magistrate did not apply a rigid enough congruity analysis to the offenses for which the government seeks extradition. Specifically, appellant asserts that the magistrate should have determined not only if appellant's acts would be considered criminal in the United States as well as in England, but that he should also have compared each English offense with a corresponding American of-

fense and determined that the elements, purposes, and punishments of those offenses were "substantially analogous". According to appellant's theory, if provisions defining two offenses punish similar conduct but differ in the scope of their liability, the double criminality requirement is not satisfied.

The Supreme Court decisions on this issue do not support the view advanced by appellant. In *Collins v. Loisel, supra,* 259 U.S. 309, 42 S.Ct. 469, 66 L.Ed. 956, the appellant argued that the offense for which India sought extradition, "cheating", which could be based on a false representation of performance of some future act, was not comparable to the offense of false pretenses under Louisiana law because the latter offense required a misrepresentation of a past or present fact. The Court rejected this argument, stating:

> "The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Id.* at 312, 42 S.Ct. at 471.

Similarly, in *Kelly v. Griffin, supra,* 241 U.S. 6, 36 S.Ct. 487, 60 L.Ed. 861, Canada had requested extradition for charges of perjury. Under Canadian law, conviction of the crime of perjury did not require proof that the false statements were material, while under the law of the asylum state, Illinois, materiality was a necessary element of the offense. The Court found no significance, however, in the mere possibility that some false statements might fall within the scope of the Canadian law that would not constitute perjury in Illinois. *Id.* at 14, 36 S.Ct. at 489. Because the state-

---

9. Appellant argues that even if the asylum state's law is properly considered, because he was arrested in Vermont and "forcibly taken into New Hampshire", Vermont must be considered the asylum state. To allow the government to invoke New Hampshire law in support of its extradition motion, he argues, would foster forum shopping when the law of the state of a fugitive's arrest would not support extradition. Whatever merit there may be in that

argument, the appellant has not presented any evidence that the FBI agents acted in bad faith by removing him from Vermont to New Hampshire. Nor is there any reason to believe that they moved appellant to New Hampshire for the purpose of taking advantage of that state's "idiosyncratic" law. At the time Brauch was a resident of Hanover, New Hampshire, which is on the New Hampshire-Vermont border. His presence in Vermont was merely fortuitous.

ments on which the Canadian charges were based were "highly material" and there was "no attempt to go beyond the principle common to both places", the Court upheld the extradition order. *Id.* at 14–15, 36 S.Ct. at 489.

We find Judge Friendly's opinion in *Shapiro v. Ferrandina, supra,* 478 F.2d 894, on which appellant relies for the proposition that extradition can be based only upon the comparability of the *offenses* rather than the mutual criminality of the *acts* on which they are based, to be distinguishable. Invoking the "rule of specialty", which provides that a fugitive may not be tried by the requesting country for any offenses other than those for which extradition was granted, Judge Friendly scrutinized the elements of each of the crimes for which the Israeli government had requested extradition and demanded strict correspondence of each charge to some felony under United States law. This approach was prompted by a concern that "the multiple characterizations of the acts charged raise potential problems of greatly increased punishment through successive sentences." *Id.* at 909. In this case, however, Great Britain has sought extradition for only a single offense for each of the alleged acts of appellant.[10] We agree that under the principle of specialty, which is incorporated in Article XII of the Treaty, we must examine the extraditability of each of the offenses in the extradition request. But we hold that this requires us only to determine that the acts upon which the English charges are based are proscribed by similar criminal provisions of federal law, New Hampshire law, or the law of the preponderance of the states.

1. *The Check Charges.* The check charges in the English indictment were based upon appellant's alleged use of bad checks to gain a "pecuniary advantage, namely the evasion of a debt." The magistrate found that the appellant's scheme to forestall the liquidation of his commodities trading accounts would constitute a felony under both the New Hampshire consolidated theft statute, R.S.A. 637:4,[11] and the New Hampshire bad check statute, R.S.A. 638:4.[12] Appellant argues that neither of these New Hampshire offenses is comparable to the English offense of engaging in deception to gain a pecuniary advantage, since the latter punishes conduct that would not be criminal under the New Hampshire provisions. Our inquiry, however, is not whether all conduct punishable under the English theft act would be criminal under these statutes, but whether the particular conduct in this case is made criminal under both countries' laws. Moreover, we need not analyze each of the statutory provisions under which appellant's acts might be deemed criminal; it is sufficient that there be one such comparable offense. We find that with respect to the check charges, appellant's conduct falls within the literal scope of R.S.A. 638:4, the New Hampshire bad check statute, and therefore prima facie satisfies the double criminality requirement of the Treaty.

Although we do not accept appellant's argument that strict congruity of offenses is necessary to meet the test of double criminality, we agree that the offenses of the two countries must be substantially analogous. In this instance both of the provisions—section 16(1) of the English theft act and R.S.A. 638:4—punish conduct

10. Appellant was originally indicted for two separate offenses with respect to each of the ten illegal currency transactions alleged: one for violation of the Exchange Control Act and another for violation of section 15 of the Theft Act. The British government, however, has only sought extradition with respect to the indictments under the Theft Act, apparently recognizing that violations of the Exchange Control Act are not made extraditable by the Treaty.

11. R.S.A. 637:4 provides in part:

"I. A person commits theft if he obtains or exercises control over property of another by deception and with a purpose to deprive him thereof."

12. R.S.A. 638:4 provides in part:

"I. A person is guilty of issuing a bad check if he issues or passes a check for the payment of money knowing or believing that it will not be paid by the drawee and payment is refused by the drawer."

similar to the Treaty offense of obtaining property by false pretenses. Appellant argues that the acts alleged involved no deprivation of property, but merely the postponement of a preexisting debt. However, the record indicates that appellant's check-kiting resulted in greater losses to his brokers than they would have suffered if they had liquidated his holdings at the time of their first margin calls. Because the market value of the commodities credited to Brauch's accounts was falling, when his brokers relied on the soundness of his checks written to meet the margin calls on those accounts they were in effect advancing him additional credit. Appellant obtained more than just the postponement of a debt; he gained the opportunity to continue speculating in the market and possibly reaping a profit, while his brokers bore the full risk of any further losses. Both the opportunity and the risk constituted something of value. Both the English theft act provision covering evasion of a debt and the New Hampshire bad check statute in this instance punish conduct falling within the broad scope of the offense of obtaining property by false pretenses. *See generally* W. LaFave & A. Scott, Handbook on Criminal Law §§ 90, 92 (1972).

■ 2. *The Forgery Charges.* The forgery counts in the English indictment, charging appellant with uttering forged documents, on their face fall within the schedule of Treaty offenses, which includes "an offense relating to counterfeiting or forgery". The magistrate found that ap-

pellant's acts forming the basis of these charges, sending or causing to be sent telexes to Cometco's London bank assuring it that the check tendered by appellant was backed by sufficient funds, would constitute an offense under both the federal wire fraud statute, 18 U.S.C. § 1343,[13] and the New Hampshire forgery law, R.S.A. 638:1.[14] Appellant argues that the offense of federal wire fraud is completely different from that of forgery, sharing only the single common element of fraud, and therefore cannot satisfy the double criminality standard. With respect to the New Hampshire forgery law, he argues that the forged telexes he allegedly "uttered" are not within the class of documents the forgery of which constitute a felony under that statute. We find, however, that the magistrate was correct in holding that appellant's acts come within the reach of the New Hampshire forgery law.

Section 638:1 III provides that the utterance of a forged writing with intent to defraud is a class B felony under the statute if the "writing" is or purports to be "a check, an issue of stocks, bonds, or any other instrument representing an interest in or a claim against property, or a pecuniary interest in or claim against any person or enterprise." The crucial question is whether the telexes informing the London branch of the Bank of Montreal that funds credited to Cometco's account were en route to London constituted documents representing a pecuniary interest in property or a claim against the bank. We agree with the

---

**13.** 18 U.S.C. § 1343 provides in part:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

**14.** R.S.A. 638:1 provides in part:

"I. A person is guilty of forgery if, with purpose to defraud anyone, or with knowl-

edge that he is facilitating a fraud to be perpetrated by anyone, he:

(b) Makes, completes, executes, authenticates, issues, transfers, publishes or otherwise utters any writing so that it purports to be the act of another, or purports to have been executed at a time or place or in a numbered sequence other than was in fact the case, or to be a copy of an original when no such original existed.

II. As used in this section, 'writing' includes printing or any other method of recording information, checks, tokens, stamps, seals, credit cards, badges, trademarks, and other symbols of value, right, privilege, or identification."

government's contention that if the telexes had been genuine, it is likely that Cometco would have had a cause of action against the Bank of Montreal based on its detrimental reliance on the telexes. While neither party has cited New Hampshire case law that allows us to predict with certainty whether uttering these telexes would constitute felonious forgery under R.S.A. 638:1, we are satisfied that the appellant's conduct is sufficiently within the scope of that statute to meet the double criminality requirement.

■ 3. *The Currency Charges.* The government's argument for extradition for appellant's acts in connection with his currency transactions rests solely on the English charges that these transactions were violative of section 15(1) of the Theft Act of 1968. The magistrate found the double criminality test satisfied because the acts supporting these charges would also have constituted felonies under the New Hampshire theft statute, R.S.A. 637:4. Appellant argues that even though the English charges are denominated violations of that country's theft act, they rest solely on the alleged violations of the Exchange Control Act, which was enacted to further monetary policies peculiar to Great Britain and has no analogue in American law. Thus, appellant's brief asserts that "but for the system of exchange controls, Brauch would have been a shrewd business man." We reject this argument. The significant common element in section 15(1) of the Theft Act of 1968 and R.S.A. 637:4 is "deception". It is depriving another of property by means of deception that both statutes proscribe as criminal behavior. We do not think that the double criminality requirement extends so far as to require that the reason particular conduct constitutes deception be some substantive law common to both jurisdictions.[15]

■ Appellant argues further that the currency transactions could not constitute deprivation of property by deception be-cause there was no victim of the deception; no private individual suffered any loss as a result of his fiscal chicanery. He bases this contention on the workings of the Exchange Control Act, which provided that once currency had been certified as "investment currency" it could not thereafter be "unscrambled" from other legitimate currency. Thus, he argues, the initial purchaser from appellant, and any subsequent purchasers, got exactly what they bargained for: fungible investment currency. The magistrate rejected this argument, holding that there need not be any immediate loss to an identifiable victim, but only the potential for such loss. Because he found in the regulations promulgated under the Exchange Control Act the authority to "unscramble" fraudulent transactions such as those allegedly engaged in by appellant, he concluded that there was a theoretical victim of appellant's scheme.

We do not find the magistrate's "theoretical victim" scenario convincing. Nor can we accept the government's argument that the double criminality requirement is satisfied because the currency scheme comes within the ambit of the crime of obtaining property by false pretenses. It is true that there is some authority for the government's assertion that the crime of false pretenses does not require that the person from whom the property is obtained (in this case, those individuals who exchanged their pounds sterling for appellant's falsely certified investment currency) suffer any financial loss. *See United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932); W. LaFave & A. Scott, Handbook on Criminal Law 669–70 & n. 97 (1972). In this case, however, both the English statute under which appellant was charged and the comparable New Hampshire statute criminalize the "deprivation" of another person's property. While those who purchased investment currency from appellant may have been deceived, the facts do not support a finding that they suffered any deprivation of property; they

---

15. Nor is the notion that violations of monetary regulations should give rise to criminal liability totally foreign to American jurisprudence. *See* 31 U.S.C. §§ 1058, 1059 (providing criminal penalties for violation of provisions regarding reports of currency and foreign transactions).

appear to have obtained precisely what they paid for. We conclude that since the particular conduct in this case is not criminal under either section 15(1) of the Theft Act of 1968 or under R.S.A. 637:4, appellant is not extraditable on these charges.

### C. *Probable Cause*

 Article IX(1) of the Treaty provides that "[e]xtradition shall be granted only if the evidence be found sufficient according to the law of the requested Party . . . to justify the committal for trial of the person sought if the offense of which he is accused had been committed in the territory of the requested Party." The magistrate stated explicitly the evidentiary basis for his findings of extraditability with respect to each of the separate charges against appellant. Our review under these circumstances is limited to determining whether in fact there was "any" evidence providing the magistrate with a "reasonable ground to believe the accused guilty." *Fernandez v. Phillips, supra,* 268 U.S. at 312, 45 S.Ct. at 542.

We have no difficulty in finding that there was sufficient evidence before the magistrate to support his probable cause findings with respect to the charges arising out of the commodities transactions. Appellant argues that there was no factual basis for the check charges, since he had obtained nothing of value in exchange for his "rubber" checks. But the record supports the magistrate's conclusion that appellant obtained the opportunity to speculate on the commodities markets without further risk of loss to himself, and that his actions therefore deprived his brokers of something of value. Appellant also contends that there was no probable cause to support the forgery charges because no evidence directly connected him with the sending of the telexes. Furthermore, he argues, there is no evidence that the telexes were in fact false. We find neither of these arguments convincing. That the check from Skokie Investments was never paid is sufficient evidence for the purposes of our review that the telexes were false. With respect to the contention that the facts do not link appellant to the telexes, we find the inference drawn by the magistrate—that none of the other parties involved had any plausible reason to send the telexes—to have been a reasonable one based on the underlying facts.

In summary, we affirm the order of extradition for the charges arising under section 16(1) of the Theft Act of 1968 and section 6(1) of the Forgery Act of 1913, but we reverse that part of the order authorizing extradition for charges arising under section 15(1) of the Theft Act of 1968.

*Affirmed in part; reversed in part.*