In re The Extradition of David Robert McELVY and Howard John McElvy, Petitioners,

v.

Honorable Benjamin CIVILETTI, United States Attorney General, by and through the Office of the United States Marshal in and for the United States District Court, Southern District of Florida, Respondent.

No. 81–8007–Civ–NCR.

United States District Court, S. D. Florida.

March 10, 1981.

M. Lee Thompson, West Palm Beach, Fla., for petitioner.

Asst. U. S. Atty. Steven Hartz, Miami, Fla., for respondent.

ROETTGER, District Judge.

Petitioners in this matter seek a writ of habeas corpus after a certificate of extraditability was entered by a United States Magistrate for the Southern District of Florida on October 9, 1980. The Magistrate concluded that extradition was required under Article VIII(1) of the Extradition Treaty between the United States of America and the United Kingdom.

This court's jurisdiction is founded upon 28 U.S.C. § 2241(a). Petitioners initially sought two distinct forms of relief. First, at the time of the filing of the petition petitioners prayed for immediate release from custody pursuant to 18 U.S.C. § 3188, arguing that the statute limits periods of custody pending extradition to two months and that incarceration in the instant case exceeded the period allowed by the statute. Second, the petitioners sought discharge from the certificate of extraditability arguing that the requirements of the treaty were not met.

The extradition documents admitted into evidence at the hearing reveal that petitioners, who are brothers, were convicted in October of 1979, of a violation of the Turks and Caicos Island's Drug Control Ordinance of 1976. The convictions resulted in sentences of two and one-half years "hard labour" for each petitioner. Shortly thereafter, in November, 1979, petitioners escaped and fled the islands. In April of 1980, petitioners surrendered themselves to the authorities in this country. During the period of April 29, 1980 until October 9, 1980, one petitioner remained free while the other remained in custody, one brother acting as bond for the other on a monthly rotating basis. Both petitioners have remained in continuous federal custody from the conclusion of the Magistrate's hearing on October 9, 1980 until the present.

At the initial hearing this court concluded that the right of immediate release after two months of continuous custody, conferred by 18 U.S.C. § 3188, had been waived, and that the waiver was in full force and effect at the time of the filing of the petition. Additionally, the court stayed any extradition during the pendency of these proceedings.

## THE TRAIL LEADING TO THIS COURT

The extradition papers chronicle the events which led to petitioners' arrest and which form the factual basis for the indictment's allegations. On May 21, 1979, on the South Dock area of Providenciales, Turks and Caicos Islands, a local police officer observed a trail of what he believed to be marijuana. The officer followed the trail to a government warehouse. At the warehouse he observed fresh tire tracks similar to those made by a pick-up truck.

Alerted to the possibility that marijuana smuggling was afoot, the officer, now accompanied by other police officers, made an inspection of the entire dock area. It appeared to the officers that marijuana had been off-loaded at the dock, stored in the government warehouse, and later removed by pick-up truck. The officers then decided to search other warehouses in Providenciales; this led them to Stam's warehouse.

The officers found seeds and other vegetable matter scattered in the front of Stam's warehouse; this later proved to be marijuana. Inside the warehouse the officers discovered 800 bales of marijuana; each bale weighed approximately 50 pounds.

There is only one house located near the South Dock area; petitioners resided in that house with their parents who were vacationing in the United States at the time. Knowing that petitioners' father ran a fuel-depot business in the South Dock area, the officers decided to question them. Apparently suspecting that they would find him there, the officers proceeded to the Third Turtle Inn to question David McElvy. Upon their arrival at the Third Turtle, McElvy was observed parking his pick-up truck and heading into the hotel. Peering into the truck-bed, the officers noticed vegetable matter and the odor of marijuana.

Obviously convinced that McElvy was in some way involved with the marijuana at Stam's warehouse, the police informed McElvy that they suspected him of possession of marijuana. McElvy denied he was in any way involved but was arrested.

The officers, with David McElvy in their custody, proceeded to petitioners' residence which is located about 150 yards from Stam's warehouse. On the front porch the officers observed scattered vegetable matter which later proved to be marijuana. A search of the house was then undertaken. At that time petitioners David McElvy and John McElvy were present as was a co-defendant, Phillip Kinmon. The latter two individuals appeared to be quite groggy.

On the front porch two pairs of blue jeans were discovered; both pairs were dirty. One pair was claimed by David McElvy and the other by Kinmon. Vegetable matter, which later proved to be marijuana, was found in the pockets of each pair of jeans. Four additional pairs of trousers were found in a hamper in the house, and each pair contained the same vegetable matter. John McElvy admitted that the

trousers were his and that the substance in the pockets was marijuana.

A trailer was located near the house was found to contain 250 bales of marijuana; each bale weighed approximately 50 pounds. When questioned, petitioners stated that the trailer belonged to another individual. A second trailer containing 615 bales of marijuana was located at an unused fisheries' compound within five hundred yards of the house. Still a third trailer containing 270 bales of marijuana was found near the fisheries' compound. Several witnesses reported seeing men transferring its contents to an automobile earlier.

Further investigation disclosed that a vessel, the *Miranda*, had come to the South Dock on the morning of May 21, 1979 and that Stam's warehouse had been empty prior to that time. The *Miranda* was not searched while in port; however, during an earlier custom's inspection nothing unusual was observed on board the vessel.

The indictment filed subsequent to the investigation averred that between May 19, 1979 and May 21, 1979, at Providenciales, petitioners unlawfully had in their possession a quantity of cannabis in violation of Section 6(2) of the Drug Control Ordinance.

## THE WAIVER UNDER 18 U.S.C. § 3188

In reliance upon 18 U.S.C. § 3188, petitioners sought discharge from custody during the pendency of this matter.

The salient facts with respect to the claim framed by § 3188 are not complex. After the magistrate certified that petitioners were extraditable on October 9, 1980, there occurred a flurry of activity involving petitioners, their counsel and family, and representatives of the United States Department of State.

Apparently under the apprehension of an immediate issuance of a warrant of surrender by the Department of State, counsel for petitioners, at a conference about extradition matters with the Deputy Legal Advisor in Washington on December 8, 1980, executed a waiver of the two-calendar-month discharge requirement of § 3188 upon condition that the Department of State propound two questions to the United Kingdom pertaining to the offense allegedly committed by petitioners. Specifically, the waiver provided:

"I have requested that you seek from the United Kingdom the answers to two questions which could affect the extraditability of my clients. You [State Department] have undertaken to advise me by December 19 of the answers to those questions."

The questions essentially were whether the alleged offense is a felony under British law and whether extradition was vitiated by having not been perfected by December 4, 1980. The waiver additionally provided that petitioners retained the right to cancel it on two weeks' written notice to the Department of State.

Subsequently, both questions were answered adversely to petitioners by the United Kingdom. A representative of the Department of State telephonically communicated this information to petitioners' counsel on December 19, 1980. The conversation concluded with petitioners' counsel advising that he would seek judicial review.

The Department of State agreed to delay the warrant of surrender until after the holidays to permit the matter to be decided in the court. The instant petition was filed on January 14, 1981. A copy of the petition was not served on the Department of State until January 30, 1981.

The statute provides in pertinent part: "Whenever any person who is committed for rendition to a foreign government to remain until delivered up in pursuance of a requisition is not so delivered up within two calendar months after such commitment . . . any judge of the United States . . . may order the person so committed to be discharged out of custody, unless sufficient cause is shown to such judge why such discharge ought not to be ordered."

18 U.S.C. § 3188.

The running of the time specified in the statute has been held to be a sufficient basis upon which to order that a petitioner

be discharged from custody during the pendency of proceedings considering the validity of extradition. *In re Factor's Extradition*, 75 F.2d 10 (7th Cir. 1934).

With respect to § 3188, Mr. Justice Goldberg of the Supreme Court has stated:

"[I]ts purpose [is] to ensure prompt action by the extraditing government so that the accused would not suffer incarceration in this country or uncertainty as to his status for long periods of time through no fault of his own."

*Jimenez v. United States District Court*, 84 S.Ct. 14, 11 L.Ed.2d 30 (1963).

In *Jimenez*, supra, petitioner sought a stay of extradition from Mr. Justice Goldberg pending consideration by the full Court of his claim that the lower courts had erred in failing to order his immediate release under § 3188. In denying the application for a stay, Justice Goldberg stated that "[t]he common-sense reading of § 3188 is that where, as here, the accused has instituted and pursued review of his extradition order, the two month period runs from the time his claims are finally adjudicated, not from the time of the original commitment order he has been challenging." *Jimenez v. United States District Court*, 84 S.Ct. at 18.

■ The rule announced in *Jimenez* is consonant with the obvious intent of § 3188: Where the delay in effecting extradition is caused by the requesting nation, a petitioner ought not wallow in jail. He is entitled to immediate release at the conclusion of the two-calendar-month period. Conversely, where the delay is caused by consideration of the petitioner's claims by the courts of this, the asylum, country, he is not entitled to release at the conclusion of the two-calendar-month period from the entry of the certificate of extraditability but two months after the final adjudication of his claims.

■ The foregoing analysis is not dispositive in this instance; however, the principles can be expanded and applied to fit the facts of this case. Here, the magistrate entered the order certifying extraditability on October 9. There is nothing in the statute or the case law which prevents the assumption that the period provided by § 3188 started to run at that point. United States Magistrates derive their power to entertain complaints seeking certification of extraditability from 18 U.S.C. § 3184; the statute clearly contemplates an evidentiary hearing in which petitioners are entitled to present their arguments with respect to the validity of extradition. Thus, if a petitioner fails to appeal from an adverse ruling at the conclusion of the magistrate's hearing, the hearing acts as a final adjudication of his claim within the meaning of *Jimenez*. To hold otherwise would subject individuals, who are incarcerated pursuant to another nation's request for extradition and who have not sought appeal, to indefinite confinement. Congress did not intend for residents of this country to be confined during a period of indefinite status subject to the "leisurely movements" of the requesting government. *In re Dawson*, 101 F. 253 (C.C.N.Y.1900).

■ Here, the period commenced but was tolled or terminated on December 8, 1980, one day prior to the expiration of two calendar months through the written waiver signed by petitioners' counsel on their behalf. Petitioners assert that the telephonic conversation of December 19 constituted cancellation as contemplated by the waiver. As the court construes the waiver, written notice by petitioners is required for cancellation. Thus, the telephonic communication of December 19, did not constitute a cancellation by petitioners. The waiver therefore remained in effect until the filing and service of the instant petition. Service on the Department of State was not perfected until January 30, 1981. At that time the two weeks' notice, as provided by the waiver, commenced and cancellation became effective.

Fourteen days after the hearing on the merits, petitioner filed a supplemental petition under § 3188, asserting that the time remaining of the two-calendar-month period ran after this court denied the petition on the merits.

■ Petitioners' interpretation plainly does not square with *Jimenez* and the statute. The only common-sense reading of the statute is that the two-calendar-month period provided in the statute commences after the final adjudication of petitioners' claims. There may be situations in which the final adjudical is embodied in the certificate of extraditability issued by the magistrate. However where, as here, petitioners have sought review through a petition for writ of habeas corpus and procured a stay during the pendency of the matter, the period begins to run anew after a final adjudication in the district court or at the expiration of the stay, whichever occurs later. Consequently, the waiver did not toll the two months' period: it started anew. To hold otherwise would thwart the purposes of the treaty by ignoring the practical considerations involved in informing the requesting government of the conclusion of judicial proceedings, thereby permitting the timely preparation and execution of a warrant of surrender.

Thus, petitioners' claim for immediate discharge from custody pursuant to 18 U.S.C. § 3188 fails.

## THE MERITS OF THE PETITION

■ As a starting point in its analysis, the court observes that unlike interstate extradition, which is provided for in Article 4, § 2 of the Constitution, there is no inherent requirement of international extradition. Any right of the requesting country to seek extradition, and any requirement that the asylum country extradite fugitives is created and governed by the extradition treaty; "to determine the nature and extent of the right, we must look to the treaty which created it." *Factor v. Laubenheimer*, 290 U.S. 276, 287, 54 S.Ct. 191, 193, 78 L.Ed. 315 (1933).

When considering issues concerning the construction of an extradition treaty, the courts have consistently opined: "A narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements. Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intentions of the parties to secure equality and reciprocity between them." *Id.* at 293, 54 S.Ct. at 195, *see also Collins v. Loisel*, 259 U.S. 309, 311, 42 S.Ct. 469, 470, 66 L.Ed. 956 (1922).

The treaty governing this matter is the Extradition Treaty between the government of the United Kingdom and the government of the United States. The Extradition Treaty was extended by exchange of letters in 1976 to include the Turks and Caicos Islands, a dependency of the United Kingdom. Article III of the Treaty states:

"(1) Extradition shall be granted for an act or omission of the facts of which disclose an offense within any of the descriptions listed in the Schedule annexed to this Treaty, which is an integral part of the Treaty, or any other offense, if:

(a) the offense is punishable under the laws of both parties by imprisonment or other form of detention for more than one year or by the death penalty;

(b) the offense is extraditable under the relevant law, being the law of the United Kingdom or other territory to which this Treaty applies by virtue of sub-paragraph (1)(a) of Article II; and

(c) the offense constitutes a felony under the law of the United States of America."

The offense alleged here, an offense with respect to cannabis, is included as item 12 in the annex to the treaty.

■ A narrow scope of judicial review is a logical corollary to the principles requiring liberal construction of the treaties. Direct appeal from a certificate of extraditability is not available, *Greci v. Birknes*, 527 F.2d 956, 957 (1st Cir. 1976), and the reviewing court may only consider "[w]hether the magistrate had jurisdiction, whether the offense charged is within the treaty and by a somewhat liberal construction, whether there was any evidence warranting the finding that there was reasonable ground to

believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925).

█ Petitioners have argued that the offense for which they were convicted was not a "felony under the law of the United States of America" as required by the Treaty. In support of their argument petitioners assert that their conviction was under a statute which proscribed possession of any quantity of marijuana and that the conviction was for physical possession of a miniscule quantity of marijuana. Petitioners suggest that they were held criminally liable only for the marijuana seized at the residence, and not for the vast quantities contained in the warehouse and trailers.

To be sure, the ordinance under which petitioners were convicted, the Drug Control ordinance of 1976, paints with a much broader brush than our laws. It proscribes possession of any quantity of marijuana. Additionally, the maximum penalty under the law does not depend solely on the nature of the offense; it varies depending upon which tribunal hears the case. The extradition documents indicate that the case was heard by the Supreme Court of the Turks and Caicos Islands and the penalty imposed, two and one-half years "hard labour", could only have been imposed by the Supreme Court. If a magistrate had heard the case, the maximum possible sentence would be six months' imprisonment. It is apparent that the American misdemeanor-felony distinction, at least insofar as the drug offenses are concerned, is unknown to the law of the Turks and Caicos.

In its purest form petitioners' argument is that they were convicted of possession of a small amount, the equivalent of a misdemeanor in this country, and only procedural caprice—allowing the trial to be held in the Supreme Court—permitted the harsh penalty. See also *Knoetze v. United States*, 472 F.Supp. 201, 207 et seq. (S.D.Fla.1979). Therefore, petitioners have asserted that the third requirement of Article III of the treaty, that the offense "constitutes a felony of the law of the United States" has not been met.

The court has found no reported cases construing this subsection of the Treaty. However, the authority considering the subsection (a) of Article III is instructive.

With respect to the later provision, it has been stated that it "imposes on all extraditable offenses, a requirement of 'double criminality'—that is, an offense for which extradition is sought must be a serious crime punishable under the laws of both countries. The requirement that the acts alleged be criminal in both jurisdictions is central to extradition law and has been embodied explicitly or implicitly in all prior extradition treaties between the United States and Great Britain since the Jay Treaty of 1794." *Brauch v. Raiche*, 618 F.2d 843, 847 (1st Cir. 1980).

In *Brauch v. Raiche*, the court determined, *inter alia*, that there need not be complete congruity between the relevant offenses; the test of double-criminality is met where the offenses of the two countries are "substantially analogous." *Id.* at 851. Thus, the offenses allegedly committed by petitioners in the United Kingdom were "substantially analogous" to offenses under the law of this country despite the fact that the statutes proscribing the conduct were dissimilar in several respects. Implicit in the use of a flexible standard with respect to the double-criminality issue, is that the courts must approach challenges to extradition with a view towards finding the offenses within the treaty.

In the instant case, petitioners have not raised questions as to choice of law. However, the determination as to whether the offense for which they were convicted "constitutes a felony under the law of the United States of America," cannot be made until after the court decides which law applies.

In addition to considering the double-criminality question, the court in *Brauch v. Raiche, supra,* reviewed a choice-of-law decision made by the magistrate certifying extraditability. The court, in attempting to resolve what clearly is an unsettled area of law, traced the development of choice-of-law principles as they apply to extradition.

After noting the demise of the early view that "extraditability could be established only on the basis of the asylum state's law,"

*id.* at 848, (citing *Wright v. Henkel*, 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948 (1903) and *Collins v. Loisel*, 259 U.S. 309, 311, 42 S.Ct. 469, 470, 66 L.Ed. 956 (1922)), the court surmised that the prevailing and better view is that where there are competing constructions of a treaty, the court should opt for a construction which "enlarges the rights of the parties under the treaty." *Brauch v. Raiche* at 850. Thus, the court upheld the magistrate's application of the law of the asylum state, even though he had not determined whether the law chosen was representative of that of the preponderance of the states.

In the case at bar, depending upon choice of law and petitioners' characterizations of their convictions, there are several possible permutations. Petitioners could, if their characterization is accepted, succeed under two. If it is true, as petitioners suggest, that the conviction in the Turks and Caicos was for simple possession of a minute amount of marijuana, their conduct would fall within either 21 U.S.C. § 844(a) which proscribes simple possession of any amount of marijuana, *United States v. Maspero*, 496 F.2d 1354 (5th Cir. 1974) or Florida Statute § 893.13(1)(f) which proscribes possession of small amounts of marijuana.[1]

Petitioners make a logical argument under either statute that, assuming the conviction was for simple possession of the small amount, the third requirement of the treaty has not been met because the offense is not a felony under the law of the United States. On the other hand, if the court is persuaded that the government is correct in asserting that the conviction in the Turks and Caicos was for actual or constructive possession of the quantity of marijuana in the trailers and the warehouse, the convic-

tion is equivalent to one under F.S.A. 893.-13, a felony. Moreover, if intent to distribute can be inferred from constructive possession of the vast amount of marijuana in the warehouse and trailers, the equivalent offense is 21 U.S.C. § 841(a)(1), also a felony.

When petitioners' argument is viewed in its most favorable light they have shown, at best, a theoretical possibility that the conviction in the Turks and Caicos is not equivalent to a "felony under the law of the United States of America", as contemplated by the Treaty.

Ultimately petitioners' arguments fail under either federal law or Florida law. When the court is presented with conflicting constructions, the clear weight of authority mandates a construction which expands the rights of the parties to the Treaty. *Factor v. Laubenheimer, supra, Brauch v. Raiche, supra.* The procedural posture of the case, as well, favors the denial of the instant petition. Here petitioners were indicted, tried, convicted and incarcerated; they are presently fugitives from justice. Those considerations which require liberal interpretation of the Treaty become even more ponderous where there has been conviction and escape. It must also be noted that petitioners had filed an appeal to the reviewing court in the Bahamas at Nassau; predictably, the appeal was dismissed without reaching the merits after petitioner's escape.

The court must additionally observe that petitioners' argument with respect to the facts underlying their conviction is entirely implausible. There is more than ample evidence to support, perhaps require, the conclusion that they were involved in marijuana smuggling on a grand scale.[2] The tracks

---

1. Petitioners have not sought the application of the law of a preponderance of the states. Neither petitioners, the government, nor the court has undertaken a survey of the laws of the other states. The court, however, does note that possession of marijuana as a felony or misdemeanor is proscribed by most states. 28 C.J.S. Drugs & Narcotics Supplement § 3.

2. This court certainly does not hold that a foreign conviction must contain all the elements of an analogous offense in this country, or that the legal theories underlying the conviction be completely congruous. However, for illustrative purposes, intent to distribute can be inferred from possession of larger quantities of controlled substances. *United States v. Marchildon*, 519 F.2d 337, 344–47 (8th Cir. 1975). Such possession may be actual or constructive.

near the South Dock warehouse were believed to be those of a pick-up truck; David McElvy was seen driving such a truck, and it bore evidence of marijuana. At the McElvy residence, several pairs of soiled trousers belonging to Kinmon and petitioners were found, and each pair contained marijuana. Marijuana was found scattered about the porch of the McElvy residence.

Each of the warehouses in which marijuana was found is located near petitioners' former residence; Stam's warehouse, in which 800 bales of marijuana was stored, is a mere one hundred and fifty yards from the house. Three trailers containing marijuana were located very near the house; one trailer was on the property, and the two others were at or near the abandoned fisheries compound some five hundred yards from the residence. In fact, the total comprised 1935 bales, or 96,750 lbs. This amount has a current wholesale value in Fort Lauderdale of more than 26 million dollars.

To find for petitioners under this set of facts, is to ascribe to a tortured interpretation of the Treaty, and to ignore rather persuasive authority. This the court does not choose to do. Accordingly, it is

ORDERED AND ADJUDGED that petitioners' application for a writ of habeas corpus seeking an order enjoining extradition is hereby dismissed. It is

FURTHER ORDERED that the request for immediate discharge from custody pursuant to 18 U.S.C. § 3188 is hereby denied.