**Frank Edward PETERS, Plaintiff–Appellant,**

v.

**Jack EGNOR, United States Marshal for the District of Colorado, Defendant–Appellee.**

No. 88–1988.

United States Court of Appeals, Tenth Circuit.

Nov. 2, 1989.

---

714

Norman R. Mueller (Saskia A. Jordan with him on the briefs) Haddon, Morgan & Foreman, P.C., Denver, Colo., for plaintiff-appellant.

Thomas M. O'Rourke, Asst. U.S. Atty. (Michael J. Norton, Acting U.S. Atty. with him on the brief), Denver, Colo., for defendant-appellee.

Before HOLLOWAY, Chief Judge, ANDERSON, Circuit Judge, and O'CONNOR,* District Judge.

STEPHEN H. ANDERSON, Circuit Judge.

In October 1987, appellant Frank Peters was arrested in Colorado on a British warrant alleging four acts of theft by deception under the Theft Act of 1968, and two violations of the Forgery and Counterfeiting Act of 1981. The British government sought extradition under the United States–United Kingdom Extradition Treaty.[1]

After a hearing, a United States Magistrate issued a Certification of Extraditability and Order of Commitment. Peters' subsequent petition to the United States District Court for the District of Colorado for a writ of habeas corpus was denied. This

---

* Honorable Earl E. O'Connor, Chief Judge, U.S. District Court for the District of Kansas, sitting by designation.

1. Extradition Treaty, June 8, 1972, United States–United Kingdom, 28 U.S.T. 227, T.I.A.S. No. 8468.

appeal followed. At each proceeding, Peters argued that there was not probable cause to extradite him, and that the doctrine of dual criminality was not satisfied. We agree with the magistrate and the district court that Peters may be extradited because both of these requirements were met with reference to each of the six charges against him.

## I. BACKGROUND

The charges against Peters arise from his efforts to raise capital for the Parrot Corporation, a company formed by Peters and others for the purpose of manufacturing computer floppy disks in Wales. Parrot Corporation Investment Report, R.Supp. Vol. I at 315 (Ex. 22). Peters contacted Neil Taylor, investment development director for the Wales Development Agency ("WDA"), a governmental corporation. The WDA agreed to be the lead investor in the Parrot project, providing a factory and one million British pounds. Another source of financing was to be a low-interest loan from the European Coal and Steel Community ("ECSC"), an agency of the European Economic Community. Bowen Affidavit, R.Supp. Vol. I at 22–23. The ECSC requires a bank repayment guarantee for loans to new ventures.

To obtain additional funding from private institutional investors, Peters and Taylor procured the services of Development Capital Group Limited ("DCG"), which agreed that if the WDA would lead the investment and arrange the ECSC loan, DCG would find additional investors. Faulkner Affidavit, R.Supp. Vol. I at 37–39. Their joint efforts persuaded CIN Industrial Investments Limited ("CIN") and Legal General Assurance Society Limited ("LGA") to invest seven hundred thousand pounds each. Commercial Union Assurance Company Limited ("CUA") agreed to invest an additional three hundred thousand pounds.

After several unsuccessful attempts to find a guarantor for the ECSC loan, Peters approached the London branch of The Northern Trust Company of Chicago ("Northern Trust"). Evans Affidavit, R.Supp. Vol. I at 102. After some negoti-

ating, a proposal was submitted to Northern Trust's main office for approval. Significantly, the proposal required that the guarantee be secured by one hundred percent cash collateral; *i.e.*, Northern Trust would guarantee Parrot's repayment of the two and one-half million pound ECSC loan only if Parrot would keep two and one-half million pounds on deposit with Northern Trust for the term of the loan, which was eight years. Buchanan Affidavit, R.Supp. Vol. I at 56–57. Consequently, the corporation's available working capital would be that much less.

Meanwhile, Peters and Taylor grew concerned that further delays in closing the deal would cause the institutional investors to back out, so a closing date of December 23, 1983 was set. Bowen Affidavit, R.Supp. Vol. I at 27. Northern Trust approved the guarantee, but a formal commitment letter could not be prepared in time for the closing. Instead, the vice-president of the London branch submitted an informal "comfort letter" which stated in full:

"We confirm that subject to:

(1) the negotiation of a satisfactory agreement between Parrot Corporation Limited and ourselves; and

(2) our review of documentation between an ECSC agent bank or institution, and Parrot Corporation Ltd.

We are prepared in principle to issue a Standby Letter of Credit guaranteeing your obligations to such bank or institution arising from their role as Agent for the European Coal & Steel Community in lending up to [ ]2.5 million [pounds] to Parrot Corporation Ltd.

We look forward to discussing the proposed transaction with you in more detail."

R.Supp. Vol. I at 313 (Ex. 21).

The closing was held as scheduled. Present at the meeting, in addition to Peters and Taylor, were representatives of the WDA, CIN, and DCG (representing LGA and CUA). They were shown the comfort letter, but not told of the cash collateral requirement. Owens Affidavit, R.Supp. Vol. I at 48–50. The most common way for a guarantee to be secured in these

circumstances would be a debenture over the assets of the company, and at least some of the investors were under the impression that that was how the Northern Trust guarantee would be secured.[2] Bowen Affidavit, R.Supp. Vol. I at 34–35. Some of those present were unhappy with the letter's vagueness, but the investment agreement was signed anyway. *Id.* at 31. The investor representatives would not have gone through with the investment had they known that their money or the borrowed funds would be used to satisfy the collateral requirement, instead of being used as working capital. *Id.* at 33; Faulkner Affidavit, R.Supp. Vol. I at 43.

A full letter of intent, containing the cash collateral requirement, was executed in January and back-dated December 22, 1983. R.Supp. Vol. I at 213–15 (Ex. 16); R. Vol. II at 11.

Northern Trust required Parrot to show that the board of directors had authorized the deposit of the collateral, so Peters signed and submitted two extracts (because the loan was distributed in two installments) of corporate minutes indicating that the board was informed of the cash collateral requirement and approved of the deposits. R.Supp. Vol. I at 172–73, 183 (Exs. 3, 6). The extracts were false. No such discussions ever took place. R. Vol. I at 42; Shakespeare Affidavit, R.Supp. Vol. I at 66.

## II. DISCUSSION

■ An extradition order cannot be directly appealed. *Collins v. Miller,* 252 U.S. 364, 369, 40 S.Ct. 347, 349, 64 L.Ed. 616 (1920). Instead, this case is before us on appeal from a denial of a writ of habeas corpus, which affords a narrower review. *Greci v. Birknes,* 527 F.2d 956, 958 (1st Cir.1976); *see Restatement (Third) of the Foreign Relations Law of the United States* § 478 reporters' note 2 (1987). Our inquiry is limited to

"determining 'whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal construction, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty.' "

*Brauch v. Raiche,* 618 F.2d 843, 847 (1st Cir.1980) (quoting *Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925)). Peters does not contest the magistrate's jurisdiction, nor does he claim that the charges against him are not extraditable crimes. He only challenges the determinations that there was probable cause to extradite him and that the principle of dual criminality was satisfied.

While on its face the doctrine of dual criminality seems to require a full-blown inquiry into both the question of whether the alleged acts would violate American law *and* the question of whether the alleged acts constitute a violation of the British statutes, we think that an extensive investigation of British law would be inappropriate. For one thing, we "are not expected to become experts in the laws of foreign nations." *In re Assarsson,* 635 F.2d 1237, 1244 (7th Cir.1980), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 325 (1981), and the issues Peters raises could require just such expertise. In addition, the issue of whether there is "probable cause to believe that there has been a violation of ... the criminal laws of the [request]ing country," *Peroff v. Hylton,* 542 F.2d 1247, 1249 (4th Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977), relates both to whether or not Peters committed the alleged acts, and to the dual criminality question of whether those acts violated British law. Because these two questions share essential material elements, the resolution of one guides the resolution of the other.

Accordingly, our discussion of dual criminality will be devoted to the matter of whether the acts alleged would violate sub-

---

**2.** According to the WDA solicitor who was at the meeting, the usual arrangement was that the bank would charge a percentage fee and take a debenture over the company's assets. At the meeting, when asked about the fee Northern

Trust would charge for the guarantee, Peters simply stated, "1%," without mentioning the cash collateral requirement. Bowen Affidavit, R.Supp. Vol. I at 31, 35.

stantially analogous American law. Whether those acts also violate the British statutes will be considered in connection with the probable cause requirement.

## A. Probable Cause

■ For a person to be extradited, there must be probable cause to hold him for trial. *Restatement (Third) of the Foreign Relations Law of the United States* § 476(1)(a) (1987); *see* Extradition Treaty, art. IX(1), 28 U.S.T. at 232 ("Extradition shall be granted only if the evidence be found sufficient ... to justify the commital for trial of the person sought...."). ·

The role of the committing magistrate in reviewing the sufficiency of the evidence is "to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." *Collins v. Loisel*, 259 U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922); *accord, e.g., Demjanjuk v. Petrovsky*, 776 F.2d 571, 576 (6th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986); *see also Restatement (Third) of the Foreign Relations Law of the United States* § 476 comment b (1987).

Habeas corpus review of the magistrate's finding of probable cause is even narrower. The court uses the "lenient standard," *Demjanjuk v. Petrovsky*, 776 F.2d at 576, of "by a somewhat liberal construction, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. at 312, 45 S.Ct. at 542. "[A]ppeal on this issue must fail if there is '*any* evidence of probable cause.'" *Theron v. United States Marshal*, 832 F.2d 492, 501 (9th Cir.1987) (quoting *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir.1986) (emphasis in original)), *cert. denied*, —— U.S. ——, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988).

■ There is sufficient evidence that Peters committed acts which violated the law of the United Kingdom to support the finding of probable cause to believe that he is guilty as charged.

The facts provide reasonable cause to try Peters on the theft-by-deception charges. The evidence shows an active role in obtaining investors and closing the deal, and that the investors were deluded about the terms of the Northern Trust guarantee.

In response, Peters first contends that he did not violate the Theft Act because he did not make any affirmative misrepresentations. To the contrary, the evidence suggests that he *did* make an affirmative misrepresentation by suggesting at the December 23 meeting that the only money Northern Trust would require in exchange for the guarantee was a one percent fee.[3]

In addition, our limited research into English law suggests that an affirmative misrepresentation is not always required to commit the crime of theft by deception. *Director of Public Prosecutions v. Ray*, [1973] A.C. 370, seems to hold that there can be deception by omission where the defendant's omission is inconsistent with a prior and continuing implied or express representation. *Regina v. Silverman*, 86 Cr. App. 213 (1987), relied upon *Ray* to hold that silence can amount to deception where mutual trust had been built up between the defendant and the victim. Also, reckless, as opposed to intentional, misrepresentation can suffice. *Regina v. Potger*, 55 Cr. App. 42 (1970).

We need not determine definitively whether any of these decisions applies to this case. It is enough to note that under

---

**3.** There is also some evidence, albeit weak, that Peters later admitted to the DCG representative that he had concealed the existence of the cash collateral requirement:

"I pointed out to Frank Peters this meant he and Neil Taylor had attended a completion meeting ... at which they had suppressed the information that clearly demonstrated that the business could expect to have a [ ]2.5 million [pound] cash deficiency.

I also stated that it must have been clear to him that if we had known about this at the time, none of us would have proceeded with the completion.

Peters said, 'You must have a very low blood pressure because I was expecting you to go through the roof.'"

Faulkner Affidavit, R.Supp. Vol. I at 43–44.

these circumstances an affirmative misrepresentation may not be necessary to violate the Theft Act.

Secondly, Peters argues that knowledge of the cash collateral requirement should be imputed to the investors, so they were not deceived about it. His theory is that Neil Taylor knew about the requirement, and Taylor was an agent of the WDA, which was an agent of the other investors. There is probable cause to believe, however, that Taylor acted adversely to the interests of his principals by not disclosing the terms of the Northern Trust guarantee, in which case his knowledge would not be imputed to them. At his criminal trial, Peters "may be able to submit substantial proof that another rather than he was the perpetrator of the fraud, but that is a matter for exploration during the trial ... and not for extensive evidentiary inquiry during the extradition hearing." *Peroff v. Hylton,* 542 F.2d at 1249.

Peters also contends that no evidence establishes a causal link between his alleged deception and the putative victims' decision to invest in Parrot, because the investors relied only on the concededly vague and tentative comfort letter. This argument is without merit. The evidence establishes probable cause to believe that there was such a causal connection if the cash collateral requirement was already a firm part of the guarantee, but Peters fostered the misconception that Northern Trust would require only a fee and a debenture.

Likewise, there was sufficient evidence to establish probable cause for the forgery charges. Under section 1 of the Forgery and Counterfeiting Act,

> "[a] person is guilty of forgery if he makes a false instrument, with the intention that he or another shall use it to induce somebody to accept it as genuine, and by reason of so accepting it to do or not to do some act to his own or any other person's prejudice."

Peters is accused of creating, signing, and submitting inaccurate extracts of Parrot's corporate minutes in order to induce North-

ern Trust to accept the deposit of the ECSC funds as cash collateral. The evidence supports the magistrate's decision that there was probable cause to believe that Peters knew that the extracts were inaccurate because the board of directors never in fact discussed the issue. Peters contends that his acts did not violate the law because the extracts were themselves genuine, not false; because he was authorized by the board to sign loan documentation; and because Northern Trust, the victim of the alleged forgery, suffered no prejudice. These arguments also are unpersuasive.

We reject the first two arguments because the evidence suggests that the extracts were not what they purported to be, *i.e.,* accurate representations of the proceedings of the board of directors. Peters' signature on the extracts does not change this. In addition, we hardly think that Peters' authorization extended to fabricating the needed documentation.

His final argument fails because the Forgery and Counterfeiting Act clearly encompasses situations in which the person receiving the forged document acts to the prejudice of a third party. There is probable cause to believe that Northern Trust prejudiced the investors when it accepted the deposit of a large proportion of Parrot's assets as cash collateral.

## B. Dual Criminality

The doctrine of dual criminality provides that a person shall not be extradited "if the offense with which he is charged ... is not punishable as a serious crime in both the requesting and requested state[s]." *Restatement (Third) of the Foreign Relations Law of the United States* § 476(1)(c) (1987); *accord, e.g., United States v. Sensi,* 879 F.2d 888, 893 (D.C.Cir.1989). The Extradition Treaty expressly incorporates this principle.[4] Whether dual criminality is satisfied is a "purely legal question" to be reviewed *de novo. Quinn v. Robinson,* 783 F.2d 776, 791 (9th Cir.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986).

---

**4.** Extradition Treaty, arts. III(1)(a), IX(1), 28    U.S.T. at 229, 232.

The magistrate found, and the district court agreed, that the acts with which Peters is charged are criminal in both countries. The Theft Act charges were determined to correspond to, *inter alia*, 15 U.S.C. § 78j (securities fraud). The acts alleged in the forgery charges were found to be proscribed by Colo.Rev.Stat. §§ 18–5–101 to 18–5–103 (forgery and simulation).

Peters does not challenge the congruity of the statutes which the magistrate used to find that the forgery charges satisfied the doctrine of dual criminality. He does, however, argue that it was improper for the magistrate to base his decision that dual criminality was present regarding the theft charges on federal securities laws. Peters contends that because he has been charged under a theft-by-deception statute, dual criminality can only be based upon a theft-by-deception (or very similar) statute. The question, then, is how much congruity between the statutes of the requested and requesting nations dual criminality requires, and whether the match between the Theft Act and federal securities law is sufficient.

Preliminarily, we note that the language of the Extradition Treaty, which states that the alleged conduct must be "punishable under the laws of both parties," [5] has been interpreted to include both federal and state law. *See Wright v. Henkel,* 190 U.S. 40, 58–59, 23 S.Ct. 781, 785, 47 L.Ed. 948 (1903); *Hu Yau–Leung v. Soscia,* 649 F.2d 914, 918 (2d Cir.), *cert. denied,* 454 U.S. 971, 102 S.Ct. 519, 70 L.Ed.2d 389 (1981); *see also, e.g., Oen Yin–Choy v. Robinson,* 858 F.2d 1400, 1405 (9th Cir.1988) (federal law), *cert. denied,* —— U.S. ——, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989); *Brauch v. Raiche,* 618 F.2d at 851 (state law).

■ While dual criminality does not require identical statutes, *Collins v. Loisel,* 259 U.S. at 312, 42 S.Ct. at 470, the provisions must be "substantially analogous." [6] *Brauch v. Raiche,* 618 F.2d at 851; *accord Theron v. United States Marshal,* 832 F.2d at 496.[7] Statutes are substantially analogous when they "punish conduct falling within the broad scope" of the same "generally recognized crime." *Brauch v. Raiche,* 618 F.2d at 848 n. 7, 852. Differences in instrumentalities or purposes are not important, so long as the statutes relate to the same general offense. *United States v. Sensi,* 879 F.2d at 893. In other words, when "the laws of both the requesting and the requested party appear to be directed to the same basic evil," *Shapiro v. Ferrandina,* 478 F.2d 894, 908 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973), the statutes are substantially analogous, and can form the basis of dual criminality.

Thus, it was held that the Theft Act and a federal mail fraud statute could form the basis of a dual criminality finding because both statutes go to the general crime of stealing. *United States v. Sensi,* 879 F.2d at 893. Similarly, dual criminality was found between the Theft Act and the New Hampshire bad check statute because both laws forbid conduct which constitutes obtaining property by false pretenses. *Brauch v. Raiche,* 618 F.2d at 851–52. *See also Restatement (Third) of the Foreign Relations Law of the United States* § 476 comment d (1987) (embezzlement substantially analogous to fraud or larceny by trick).

■ Turning to the laws *sub judice*, sections 15(1) and 16(1) of the Theft Act makes it unlawful to "by any deception dishonestly obtain[ ] property belonging to

---

5. Extradition Treaty, art. III(1)(a), 28 U.S.T. at 229.

6. At least one circuit appears to follow the broader rule that *any* criminal statute can support a finding of dual criminality so long as it relates to an extraditable offense. *See United States v. Diwan,* 864 F.2d 715, 721 n. 7 (11th Cir.1989) (finding dual criminality based upon the Theft Act and a federal child pornography statute); *United States v. Herbage,* 850 F.2d 1463, 1465 (11th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1158, 103 L.Ed.2d 217 (1989).

7. Another Ninth Circuit decision, *Emami v. United States Dist. Court for the N. Dist. of Cal.,* 834 F.2d 1444, 1450 (9th Cir.1987), can be read to require that the two statutes address "functionally identical" conduct. To the extent that this is a narrower test than that adopted in *Theron,* the Ninth Circuit appears to have chosen the latter. *See Oen Yin–Choy v. Robinson,* 858 F.2d at 1404.

another" or "any pecuniary advantage." Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5,[8] makes it unlawful

> "(a) To employ any device, artifice, or scheme to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security."

The Theft Act and Rule 10b–5 proscribe different ways of obtaining property by deception. We hold that they are substantially analogous. *See Freedman v. United States*, 437 F.Supp. 1252, 1262 (N.D.Ga. 1977) (federal securities laws substantially analogous to Canadian fraud statute); *see also Brauch v. Raiche*, 618 F.2d at 853 ("We do not think that the double criminality requirement extends so far as to require that the reason particular conduct constitutes deception be some substantive law common to both jurisdictions.").

Peters was a co-founder and part-owner of the Parrot Corporation. He stood to benefit from increased investment in the company. The substance of the four theft charges is that Peters misled four investors (WDA, LGA, CIN, and CUA) into believing that the corporation would have the proceeds of the ECSC loan to use as working capital, when in fact the company was in a much weaker financial position because either the investors' money or the proceeds of the loan would be used to satisfy North-ern Trust's cash collateral requirement. The alleged acts clearly state a violation of Rule 10b–5, for they show an omission to state a necessary material fact and a practice or course of business which would operate as a fraud or deceit.

■ The forgery charges against Peters stem from the alleged falsification of extracts of the corporate minutes to convince Northern Trust that the board of directors had authorized him to deposit the proceeds of the ECSC loan to serve as collateral for the guarantee. In other words, he allegedly "falsely ma[de] ... a written instrument which ... purport[ed] to ... evidence, create, transfer, terminate, or otherwise affect a legal right, interest, obligation, or status," in violation of Colo. Rev.Stat. § 18–5–103(1)(a). The doctrine of dual criminality has been satisfied.[9]

For the reasons stated above, the judgment of the district court is AFFIRMED.

---

**8.** Rule 10b–5 was promulgated under 15 U.S.C. § 78j(b), which makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."

**9.** Peters also argues that his extradition would violate the doctrine of specialty, which provides that "once extradited, a person can be prosecuted only for those charges on which he was extradited." *United States v. Sensi*, 879 F.2d at 892. This rule would seem to be irrelevant to this case, as it relates to prosecution rather than extradition. *See In re Extradition of Prushinowski*, 574 F.Supp. 1439, 1445 n. 4 (E.D.N.C.1983). We are unaware of any decision in which extradition was denied because of specialty. At this point in the proceedings, the doctrine of specialty requires at most no more than the doctrine of dual criminality. *Brauch v. Raiche*, 618 F.2d at 851. For the reasons stated above, then, we find that the doctrine of specialty has been satisfied.